IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

FRED STANFORD SPICER, *a prisoner*
*incarcerated at the Mississippi State*
*Penitentiary in Parchman, Mississippi*                    PETITIONER

v.                                        CIVIL ACTION NO: 1:13CV377LG-JCG

MARSHALL L. FISHER, *Commissioner,*
*Mississippi Department of Corrections*, and
JIM HOOD, *Attorney General of the State*
*of Mississippi*                                    RESPONDENTS

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the Court is a [1] Petition for Writ of Habeas Corpus pursuant to 28

U.S.C. § 2254 filed by Fred Stanford Spicer.   Following this Court's prior [41]

Memorandum Opinion and Order staying the case pending exhaustion of Spicer's

claims in state court, Spicer returned to the Mississippi Supreme Court, was denied

relief, and has returned to further pursue his Petition.   The parties filed

supplemental briefing.   Having considered the submissions of the parties, the

record, and relevant law, the Court finds that Spicer's Petition for Writ of Habeas

Corpus should be denied.

I. PROCEDURAL HISTORY

Fred Spicer was found guilty of capital murder and sentenced to death in the

Circuit Court of George County for killing Edmund Hebert.   Spicer appealed his

verdict and sentence, both of which were affirmed by the Mississippi Supreme

Court.   *Spicer v. State*, 921 So. 2d 292 (Miss. 2006).   Spicer then filed for post-

conviction relief, and the Mississippi Supreme Court granted his petition, in part.
*Spicer v. State*, 973 So. 2d 184 (Miss. 2007).   Specifically, the court found that
Spicer had made a sufficient showing that his trial counsel was ineffective at the
sentencing phase of his trial to be entitled to an evidentiary hearing on that issue in
the trial court.   Relief was denied on all of Spicer's other claims, including his claim
that his trial attorneys were ineffective during the guilt phase of his trial.

An evidentiary hearing was held in the Circuit Court of George County on
March 15-16, 2011, where substantial additional evidence was introduced in
support of Spicer's ineffective counsel claim.   After taking the case under
advisement, the trial court entered a Memorandum Decision and Order on February
22, 2012, finding that the mitigation evidence offered at the sentencing phase of
Spicer's original trial was "woefully inadequate to allow the jury to give
individualized consideration of Spicer's background and weigh the merits of
imposing a sentence less than death."   *Spicer v. State*, No. 2009-0266(3), slip op. at
12 (George Cty. Miss. Cir. Ct. Feb. 22, 2012).   For that reason, the court vacated
and set aside Spicer's sentence of death.   The court held another hearing on
September 27, 2012, during which the State announced in open court that it waived
seeking the imposition of the death penalty.   *See State v. Spicer*, No. 20-2002-
10,006(3) (Miss. George Cty. Cir. Ct. Sept. 27, 2012).   Because only one other
sentence was available under the law, Spicer was sentenced to life imprisonment
without the possibility of parole.   *Id.*

Spicer did not seek further review of his case in state court; instead, he filed a Petition for a Writ of Habeas Corpus with this Court.   In his Petition, Spicer relied on the new evidence that was offered in the trial court and argued that he is entitled to habeas relief because his trial counsel was also ineffective at the guilt phase of his trial and the Mississippi Supreme Court unreasonably denied relief on this issue.   Spicer also argued that the state court unreasonably denied relief on his claim of cumulative error.   Alternatively, Spicer argued that, even without resorting to the new evidence presented in the Circuit Court, he was entitled to relief on these claims.   Finally, if the Court determined that the new evidence made his ineffectiveness claim unexhausted, Spicer sought a stay to return to state court and exhaust that issue.

This Court granted the last request and stayed this matter so that Spicer could return to state court.   Spicer applied for leave to file a second petition for post-conviction relief.   The Mississippi Supreme Court denied relief:

> Having duly considered each of his claims, the panel finds the application for leave to be successive and time-barred, and not within one of the exceptions.   Miss Code Ann. §§ 99-39-5(2) and 99-39-27(9).   Further, despite Spicer's assertion of newly discovered evidence, we find his claims barred by *res judicata*.   Miss Code Ann. § 99-39-21(3).

*Spicer v. State*, No. 2016-M-01506-SCT, at 2 (Miss. Oct. 11, 2017).   Spicer has now returned to this Court for habeas corpus relief.   Both parties were allowed to file – and did file – supplemental briefing on the effect of the subsequent state court proceedings.

## II. FACTS

Magistrate Judge Gargiulo previously set forth the facts of this case in detail in his [38] Report and Recommendation. These facts are included herein.

At the time of his death, Edmond Hebert was living in a small trailer in Benndale, Mississippi, near Lucedale, in George County. His mother and stepfather lived in a trailer a few blocks away. Hebert worked various jobs as a sandblaster and painter, but his main occupation was laying linoleum flooring. He was working as a roofer when he was killed in October 2001. Among Hebert's possessions were a green Nissan pickup truck and a sword that hung in a display on a wall of his trailer.

A few weeks before he was killed, Hebert invited Fred Spicer to live with him in his trailer. Hebert approached his boss about giving Spicer a job on the roofing crew, and his boss, Johnny Butler, hired Spicer. People who knew Hebert became accustomed to seeing him with Spicer, and, on occasion, Spicer was seen driving Hebert's truck alone.

On or about October 11, 2001 was the last time Butler saw Hebert. It was the end of a workday, and Butler gave both Hebert and Spicer their paychecks. Later that evening, Hebert and Spicer showed up at Larry Beauchamp's house for beer and conversation. Beauchamp had known Hebert for a couple of years but had only met Spicer after he moved into Hebert's trailer. At some point in the evening, the topic of conversation turned to the possibility that Hebert might have

to leave George County to return to Louisiana; he asked Beauchamp to take care of his dog in case he had to leave. Spicer said that he would like to have the dog, but Hebert responded that he had already given it to Beauchamp. According to Beauchamp, this exchange soured Spicer's attitude. Hebert and Spicer then left Beauchamp's trailer an hour or so later in Hebert's truck.

When neither Hebert nor Spicer appeared at work the next day, Butler called Hebert's mother, Patricia Elder, to tell her that her son was fired. Mrs. Elder went to Hebert's trailer, but his truck was not there; she assumed he would not be either. She returned to the trailer two more times that day, but the truck was not present, so she returned to her trailer.

On October 12, Sergeant Brian White, a deputy with the Jackson County Sheriff's Department, was driving on Market Street in Pascagoula when he noticed a green Nissan pickup truck facing him at the intersection of Market and Highway 90. As he was turning onto Highway 90, Deputy White noticed that the truck's driver, a white male, "put a cold stare" on him. The truck also turned onto Highway 90. The driver kept staring at Deputy White. At the same time, a white female passenger put her hand over her face and tried to squat down in the passenger seat. Deputy White changed lanes to follow the truck, and he noticed that the driver continued to look at him through the rear-view mirror. While Deputy White called in the registration to dispatch, the truck moved from the far left-hand lane of Highway 90 to the far right-hand lane and turned into a

restaurant's parking lot, all without a turn signal. Traffic prevented Deputy White from changing lanes to turn into the parking lot, so he pulled into another parking lot and waited. Only a few seconds later, the truck passed that lot, but Deputy White was again prevented by traffic from following it. He saw the truck turn into a motel parking lot. When Deputy White was finally able to pull into that lot, he saw that the two individuals had gotten out of the truck and were trying to reach places where they could hide from him.

Deputy White apprehended the driver, who refused to give his name and threw away the keys to the truck he had been driving. The driver denied tossing the keys and again refused to give the deputy any information. At about that time, dispatch notified Deputy White that the truck was registered to Edmond Hebert. The driver denied being Hebert. White turned the driver over to another officer and went to look for the female passenger, who he found hiding behind a garbage can. The passenger was Angel Hinger, and she identified the driver as Freddie Spicer.

Deputy White arrested Spicer on three moving violations and conducted an inventory search of the truck. Officers found a camouflage jacket and a sword. Paperwork inside the truck indicated that it was registered to Edmond Hebert. The officers ran Spicer's name through the National Crime Information Center database, which returned a valid "hit" out of Franklin, Massachusetts for burglary. After transporting Spicer to the Detention Center, Deputy White asked a detective

to call the George County Sheriff's Department and ask them to contact the vehicle's owner.

George County Deputy John Hilbun was accordingly dispatched to Hebert's residence for a welfare check. Deputy Hilbun had trouble finding the address, so he stopped to ask directions from a man who turned out to be Hebert's stepfather, James Elder. Elder and Deputy Hilbun went to Hebert's trailer together, and Elder forced the door open. Inside, they found Hebert's body on the couch in his living room, covered with a blanket. Elder removed a tool box sitting on the blanket and uncovered Hebert's face. Hebert was lying on his back. There were bloodstains on the walls, the door, the ceiling, and the floor of the living room, as well as on a lampshade. According to an expert who testified for the State, the blood stains were cast-off blood stains, consistent with blunt force trauma or a beating. Once notified that Hebert was dead, Jackson County officers seized Spicer's clothing.

The pathologist who performed the autopsy testified that he found numerous injuries on Hebert's body, including a three and one-half inch long cut over his forehead, bruises around both eyes, a cut above the right eye and the right eyelid, and an abrasion over the bridge of his nose. According to the pathologist, the cuts could have been from the blunt edge of the sword recovered from Hebert's truck. There were also numerous injuries to Hebert's arms and hands – including broken bones – which the pathologist characterized as defensive wounds. The fatal injury

was the blow to the forehead that caused the long laceration. That blow fractured Hebert's skull. Subsequent testing revealed that blood found on the sword recovered from Hebert's truck, as well as bloodstains on Spicer's clothing, all came from Hebert.

Spicer was charged with capital murder while in the commission of a robbery. After hearing the evidence summarized above, the jury found him guilty. At the sentencing hearing, the State presented evidence that Spicer had been convicted in a prior case of two counts each of robbery, conspiracy, and kidnapping in Rhode Island. In another case, he was convicted of two counts of assault with a dangerous weapon and one count of assault with intent to murder. Spicer's attorneys presented testimony from his mother and his aunt. Both women's testimony was brief, however. Bobbie Nell Spicer identified herself as Spicer's mother and defense counsel asked her whether she had anything to say about Spicer's penalty. But she never answered because the court sustained an objection to the question. Defense counsel then elicited testimony on her knowledge of Spicer's previous incarceration in Rhode Island and her belief that he had paid his debt to society for those crimes. Regina Walters, Spicer's aunt, gave similar testimony. After hearing the evidence, the jury returned a verdict of death, finding that Spicer had been previously convicted of a felony involving the use or threat of violence and that the murder was committed for pecuniary gain during the course of a robbery.

### III. STATE COURT REVIEW

Spicer, represented by trial counsel, appealed his conviction and sentence on several grounds, and the Mississippi Supreme Court denied relief. *Spicer*, 921 So. 2d 292. In his later post-conviction proceedings, Spicer was represented by present counsel. Among the grounds urged for relief were (1) ineffective assistance of counsel, at both the guilt and sentencing phases of trial, (2) due process violations, (3) cumulative error, (4) the unconstitutionality of Mississippi's lethal injection protocol, and (5) mental retardation. The Mississippi Supreme Court rejected grounds 2 through 5 before turning to Spicer's ineffectiveness claims.

Establishing ineffective assistance of counsel requires proving both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Spicer made two primary arguments in support of the guilt-phase ineffective assistance claim. First, he argued that his attorneys failed to consult with him prior to trial and prepare a strategy for his case. Two attorneys had been appointed as trial counsel – Darryl Hurt and Sidney Barnett, who was the George County Public Defender – because this was a capital murder case. Spicer pointed to the relatively few hours of pretrial work that were recorded on attorney Hurt's time sheets. The State argued in response that the George County Public Defender, Sidney Barnett, was lead counsel, and likely did most of the work. As George County's Public Defender, he would not have been required to keep time sheets. The state court accepted the State's position in lieu of any assertion by Spicer as to the hours Barnett worked on the case. *Spicer*, 973 So. 2d at 192-93.

The court also concluded, from its review of the record, that counsel had formulated a strategy of claiming self-defense, which they discussed with Spicer. That strategy was undermined however, when Spicer refused to testify, despite the advice of his lawyers. *Id*. at 193.

Spicer's second argument was that his attorneys failed to conduct an adequate factual investigation into his case. In support, Spicer presented identical affidavits from each of his attorneys, which both contained the following statement:

> Pursuant to Mississippi Rule of Appellate Procedure 22(c)(4)(ii), I located my records related to Mr. Spicer's trial. My records include only publicly available pleadings and court records. My records do not now, nor did they ever include any notes, draft pleadings, correspondence, investigatory reports, attorney work-product, or other nonpublic information (collectively, 'Nonpublic Records').

Spicer asserted that these affidavits amounted to admission by counsel that they had performed no investigation at all, but the Mississippi Supreme court refused to fashion an ineffectiveness claim from this lack of documentary evidence of prior investigation. *Id*. at 194. Thus, the court found no grounds for relief based on Spicer's representation during the guilt phase of the trial.

The court did grant relief, however, on the claim that counsel was ineffective at the penalty phase of Spicer's trial. Spicer had shown that his attorneys' performance at sentencing was substandard. They failed to investigate and present what could have been substantial mitigating evidence of Spicer's character and childhood history. But the court found that the record before it lacked "much

needed information" necessary to determine whether this deficient performance had prejudiced Spicer. *Id.* at 191. The court accordingly "granted [Spicer] leave to proceed in the trial court in an evidentiary hearing, limited to Spicer's claim that his attorneys were ineffective for failing to investigate and present mitigating evidence of Spicer's character and childhood history at the penalty phase of Spicer's trial." *Id.*

The Circuit Court of George County conducted an evidentiary hearing. In connection with those proceedings, both of Spicer's trial lawyers gave depositions and then testified, as did family members and expert witnesses. Additionally, 146 exhibits were introduced into evidence, including family, school, and military records, as well as the records of an earlier incarceration in Rhode Island. As summarized by the trial judge in his opinion vacating Spicer's death penalty, "This evidence demonstrates a substantial amount of potentially mitigating evidence and portrays a sordid version of Spicer's childhood, one characterized by deprivation, neglect, physical abuse, violence, and substance abuse." *Spicer*, No. 2009-0266(3), slip op. at 2. Noting that neither of Spicer's trial attorneys "provided any reasonable explanation for the complete absence of any investigation or preparation for the sentencing phase of Spicer's capital murder trial," the court found that both the performance and prejudice prongs of the *Strickland* test had been met. *Id.* at 8. Spicer's death penalty was vacated. The State subsequently announced that it

waived seeking imposition of the death penalty, and Spicer was sentenced to life imprisonment without the possibility of parole.

## IV. ANALYSIS

### 1. Standard of Review

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." *Harrington v. Richter*, 562 U.S. 86, 91 (2011). Federal habeas relief for state prisoners is made available by means of 28 U.S.C. § 2254. "As amended by [the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA'), Pub. L. 104-132, 110 Stat. 1244], 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

> Section 2254(a) permits a federal court to entertain only those applications alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." Sections 2254(b) and (c) provide that a federal court may not grant such applications unless, with certain exceptions, the applicant has exhausted state remedies.

*Id.*

"Exhaustion requires that a petitioner first present the substance of his federal claims to the highest state court either through direct appeal or by state collateral review procedures." *Hatten v. Quarterman*, 570 F.3d 595, 605 (5th Cir. 2009). "To provide the State with the necessary opportunity, the prisoner must fairly present his claim in each appropriate state court (including a state supreme

12

court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

When an application includes a claim that has been "adjudicated on the merits in State court proceedings," § 2254(d) instructs that the application "shall not be granted with respect to [such a] claim . . . unless the adjudication of the claim":

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Factual determinations made by the State court are presumed to be correct and may only be rebutted by clear and convincing evidence. *Id.* § 2254(e)(1). "AEDPA's standard is intentionally difficult to meet." *Poree v. Collins*, 866 F.3d 235, 245 (5th Cir. 2017) (quoting *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015)). This "highly deferential standard for evaluating state-court rulings . . . demands that state-court decisions be given the benefit of the doubt." *Pinholster*, 563 U.S. at 181 (citations omitted).

However, "the AEDPA-mandated deference to state court decisions does not apply if the petitioner properly exhausted his claim by raising it in the state court, but the state court did not adjudicate that particular claim on the merits." *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009). The Court "instead review[s] such

13

claims de novo without apply AEDPA-mandated deference.   *Id.*   Under either standard of review, "[t]he petitioner carries the burden of proof."   *Pinholster*, 563 U.S. at 181.

## 2.   Whether the New Material May be Considered

There is no disagreement as to whether Spicer's original habeas petition is properly before this Court.   But initially at issue is whether the material added to the record as the result of Spicer's postconviction evidentiary hearing, held on remand to the George County Circuit Court, may be considered.

A claim is not fairly presented to the state court "if the additional evidence in federal court puts the claim in a significantly different and stronger position than in state court."   *Ward v. Stephens*, 777 F.3d 250, 258 (5th Cir. 2015), *overruled on other grounds by Ayestas v. Davis*, 138 S. Ct. 1080 (2018).   To put a claim in a significantly different and stronger position, "the evidence must be so significant that it 'fundamentally alter[s] the legal claim' such that, in fairness, the claim ought to be 'remitted to state court for consideration of that evidence.'"   *Id.* (citations omitted).   By Memorandum Opinion adopting Magistrate Judge Gargiulo's Report and Recommendation, this Court (1) determined that the new material from the evidentiary hearing fundamentally altered Spicer's claims such that he had not exhausted his claims in the state court and (2) stayed Spicer's petition so that he could exhaust his claims in the state court.   (*See* Memorandum Opinion and Order 7-8, ECF No. 41.)

Spicer thereafter filed an application for leave to file a successive postconviction petition with the Mississippi Supreme Court, which the court denied as successive under Miss. Code Ann. § 99-39-27(9), time-barred under Miss. Code Ann.§ 99-39-5(2), and not within one of the exceptions to these procedural bars. The court also found the claims in his application to be barred by *res judicata* under Miss. Code Ann. § 99-39-21(3).

"A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Walker v. Martin*, 562 U.S. 307, 315 (2011) (citations omitted). "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'" *Id.* at 316. However, "[w]hen application of a state law bar 'depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law. . . .'" *Foster v. Chatman*, 136 S. Ct. 1737, 1746 (2016) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985)).

Spicer now argues that the Mississippi Supreme Court's determination that his successive state postconviction petition did not fall within one of the exceptions to the procedural bars necessarily required consideration of federal law. In *Rowland v. State*, 42 So. 3d 503, 506 (Miss. 2010), the Mississippi Supreme Court held "unequivocally, that errors affecting fundamental constitutional rights are excepted from the procedural bars of the [Uniform Post-Conviction Collateral Relief

15

Act].” Spicer acknowledges that the Mississippi Supreme Court has not explicitly determined whether effective assistance of counsel is a fundamental right, but maintains that any such determination necessarily turns on federal law. Accordingly, says Spicer, this Court can consider the evidence gleaned from the state trial court evidentiary hearing notwithstanding the fact that the Mississippi Supreme Court never considered this evidence in making a merits ruling on Spicer's ineffective assistance of counsel claims.

The Court finds that engaging in this lengthy analysis – (1) whether the state supreme court relied on an adequate and independent procedural rule, and, if so, (2) whether Spicer can demonstrate cause and prejudice for any resulting procedural default – to be unnecessary and, therefore, declines to do so. In the opinion of the Court, Spicer fails to establish on the merits that he is entitled to habeas relief even if the Court considers the additional evidence presented during the state court evidentiary hearing under a *de novo* review.[1]

---

[1] It is not entirely clear to the Court which standard of review Spicer argues should apply. Spicer argues alternatively in his supplemental briefing that (1) the Mississippi Supreme Court relied on a procedural rule that is neither independent nor adequate in denying his second postconviction petition and (2) that the Mississippi Supreme Court necessarily reconsidered the merits of his ineffective assistance claims with the new evidence because the state court had to decide the merits to determine whether the fundamental rights exception to the procedural bars applied. If the state court never considered the new evidence, *de novo* review would apply. If the state court did consider the new evidence, the deferential AEDPA standard would apply. Spicer does not address this issue, but this Court will apply a *de novo* standard because the Court comes to the same conclusion under either analysis. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies . . . .")

### 3.     Spicer Has Not Established Ineffective Assistance of Counsel

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."   U.S. Const. amend VI.   Under the well-established *Strickland* test, Spicer must show (1) that his counsel's performance was deficient, and (2) that the deficient performance prejudiced his defense.   466 U.S. at 689-94.   Ineffective assistance may be found in "specific errors and omissions" or upon consideration of "counsel's performance as a whole."   *See United States v. Cronic*, 466 U.S. 648, 657 n.20 (1984).   However, "[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised".   *Pondexter v. Quarterman*, 537 F.3d 511, 525 (5th Cir. 2008).

"[T]o establish deficient performance, a [defendant] must demonstrate that counsel's representation fell below an objective standard of reasonableness." *Woodward v. Epps*, 580 F.3d 318, 325 (5th Cir. 2009) (citation, quotation marks, and brackets omitted).   The deficiency prong

> "requires that [counsel] research relevant facts and law, or make an informed decision that certain avenues will not be fruitful."   *United States v. Fields,* 565 F.3d 290, 294 (5th Cir. 2009) (internal quotation marks and citation omitted).   "[S]olid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention."   *See id.* (internal quotation marks and citation omitted).   However, the fact that an attorney reached the wrong conclusion does not necessarily make his performance deficient as the right to counsel does not guarantee error-free counsel.   *See Emery v. Johnson,* 139 F.3d 191, 197 (5th Cir. 1997); *Skillern v.*

17

*Estelle,* 720 F.2d 839, 851 (5th Cir. 1983).

*United States v. Freeman*, 818 F.3d 175, 178 (5th Cir. 2016). Indeed, a court must take steps to "eliminate the distorting effects of hindsight" and "evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. It is not the province of the court to second guess an attorney's strategic decisions; rather, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id.*

Under the prejudice prong, "the defendant normally must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different, or that counsel's errors were so serious that they rendered the proceedings fundamentally unfair or the result unreliable." *Freeman*, 818 F.3d at 178 (citing *Strickland,* 466 U.S. at 694; *Lockhart v. Fretwell,* 506 U.S. 364, 372 (1993)). "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. Under *Strickland,* this court can look at either prong first; "if either one is found dispositive, it is not necessary to address the other." *United States v. Webster,* 392 F.3d 787, 794 n.12 (5th Cir. 2004) (quoting *Buxton v. Lynaugh,* 879 F.2d 140, 142 (5th Cir. 1989)).

Given this Court's decision to assume arguendo that Spicer's new evidence may be considered in reviewing his habeas petition, the Mississippi Supreme Court's analysis of Spicer's ineffective assistance claims does not factor into the Court's *de novo* consideration of these claims. *But see Carty*, 583 F.3d at 258

18

(explaining that where the state habeas court ruled on the ineffective assistance of counsel claim, the test is whether the state court's decision was contrary to, or an unreasonable application of the *Strickland* standard).

Spicer articulates two general ways in which his trial counsel were constitutionally deficient. First, he says his trial counsel failed to consult with him prior to trial in order to develop a trial strategy. Instead, his counsel initially pursued what Spicer calls an "ill-conceived" insanity defense. When this failed, Spicer says that counsel chose to rely on a self-defense theory without investigating a basis for this theory or considering the viability of alternative defense strategies. Moreover, arguing self-defense necessarily required that Spicer testify, but Spicer argues that his attorneys failed to prepare him to take the stand. Thus, when he reasonably refused to testify, his counsel had no defense to present, and rested their case. Spicer argues that his lawyers were unprepared to counter the State's evidence or effectively cross-examine the State's witnesses.

Second, Spicer argues that his attorneys failed to conduct an adequate investigation. In his petition and supporting memorandum, Spicer reviews the forensic evidence presented at trial and argues that a more thorough investigation would have effectively countered and undermined this evidence. For example, Spicer asserts that the pathologist who testified for the prosecution, Dr. Steven Hayne, was mistaken in his conclusion that Hebert was likely killed by his own sword. Spicer counters with an affidavit from his own expert who analyzed the

evidence and concluded that the sword was not the murder weapon. Spicer also maintains that trial counsel failed to rebut the DNA evidence offered at trial, which should have been shown to be inconclusive or even exculpatory. The prosecution's expert testified that the sword blade had Hebert's blood and a third party's blood, but not Spicer's blood. And Spicer says the relatively small amount of Hebert's blood found on Spicer's clothing contradicts the notion that these bloodstains came from the murder. On the whole, he contends that effective counsel would have presented "significant and readily available exculpatory evidence that likely would have raised reasonable doubts in the jurors' minds regarding the State's unworkable theory of the case." (Mem. Supp. Pet. 30, ECF No. 2.)

At the outset, the Court notes that Spicer's representation during the guilt phase of his trial arguably left much to be desired.[2] However, Spicer has failed to meet his essential burden of demonstrating prejudice under *Strickland*. Spicer's habeas petition and briefing are heavy on critique but largely presume that prejudice must result from this amalgamation of unpreparedness, oversight, and

---

[2] Hurt, who was lead counsel on Spicer's capital murder trial, billed 63.25 hours in total for his representation. Barnett, who did not bill his time as the public defender, was second chair. Hurt testified at the evidentiary hearing that he did not know whether he expected Spicer to testify until the trial, and he testified that Spicer could not meaningfully consult with him before trial. Affidavits from Hurt and Barnett stated that their files did not contain any investigative material. Neither attorney interviewed anyone except Spicer's mother and aunt. Nor did they interview the State's witnesses or review their videotaped interviews. Neither considered hiring a private investigator, and neither considered consulting an expert.

error. The Court cannot say that the outcome of his trial would have been different but for these shortcomings or that the proceedings were unfair or unreliable because of them; the evidence pointing to Spicer's guilt was significant, perhaps even overwhelming. *See Berghuis*, 560 U.S. at 390 ("The record establishes that it was not reasonably likely that the instruction would have made any difference in light of all the other evidence of guilt."); *Pondexter*, 537 F.3d at 525 ("Even assuming the state-court decision that trial counsel's performance was not deficient is unreasonable under AEDPA, the overwhelming evidence of Pondexter's guilt precluded his establishing prejudice . . . .").

Because there were no eyewitnesses to Edmond Hebert's murder, the State's case against Spicer was mostly circumstantial. The State's evidence supporting the jury's verdict against Spicer can be summarized as follows:

1.  Spicer lived with Hebert and was the last person known to have been with him on the night of his death. Larry Beauchamp, Jerry Woodward (who owned the store where Spicer and Hebert bought beer), and Arthur Creel (Hebert's neighbor) all saw Spicer and Hebert together the day before Hebert's body was found. Beauchamp last saw them around 11:00 to 11:30 in the evening.

2.  Spicer and Hebert had visited Beauchamp earlier in the evening to drink some beer. When Spicer indicated that he wanted Beauchamp to care for his dog if he had to go back to Louisiana, Spicer's attitude soured.

3.  Neither Hebert nor Spicer showed up for work the next day. When Hebert's mother, Patricia Elder, went to Hebert's trailer to check on him, his pickup truck was gone.

4.  That afternoon, a Jackson County deputy attempted to stop Spicer, Spicer evaded him in traffic. Spicer pulled the pickup truck into a

motel parking lot, and the deputy followed. Spicer ran away and tried to hide.

5. When the deputy caught up with Spicer, he threw the keys to the truck away and refused to give his name.

6. The truck that Spicer was driving belonged to Edmond Hebert.

7. Hebert's body was found in the trailer that he shared with Spicer. There was blood splattered around the trailer interior. Dr. Hayne testified that Hebert's fatal injury was consistent with blunt force trauma that could have been caused by the blunt end of Hebert's sword. Some of the other injuries Hebert suffered appeared to be defensive wounds.

8. A sword belonging to Hebert was found in the truck that Spicer was driving. Blood on that sword, and on Spicer's clothing, was determined to be Hebert's.

Spicer's argument that his trial counsel were unprepared for trial finds support in the evidence adduced during the postconviction evidentiary hearing. But Spicer does not demonstrate that any lack of preparation prejudiced the outcome of the trial. His attorneys' trial strategies – pursuing an insanity defense and then, when that apparently failed, pursuing a theory of self-defense – may well have been ill-advised. But this is ultimately a criticism made with hindsight after Spicer's conviction. Spicer does not dispute that his attorneys were unable to meaningfully consult with him, he just says that they should have done so. The strategy Spicer says his attorneys should have pursued was to instead argue that he was not the person who killed Hebert. Nothing suggests that this theory of the case would have likely resulted in a different outcome. Strong evidence connected Spicer to the crime scene, and Spicer has not shown that the investigations he says

his counsel should have done would have yielded evidence sufficient to undermine the evidence stacked against him. Spicer has failed to show that his counsel's trial strategies, when critiqued in hindsight, resulted in prejudice. Spicer's "desire to have a specific (or here a new) defense theory presented does not amount to ineffective assistance." *King v. Davis*, 883 F.3d 577, 587 (5th Cir. 2018)(notation added).

The Court now turns to arguments surrounding trial counsel's failure to investigate Spicer's case. "Under *Strickland,* an attorney has a duty to make reasonable investigation, but a petitioner 'who alleges a failure to investigate on the part of his counsel must allege *with specificity* what the investigation would have revealed and how it would have altered the outcome of the trial.'" *United States v. Bernard*, 762 F.3d 467, 472 (5th Cir. 2014) (emphasis in original) (citations omitted); *see also Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998). Spicer contends that any investigation would have revealed that the sword found in the truck Spicer was driving was not the murder weapon. This argument is premised upon the affidavits of two experts hired post-conviction – Dr. O. C. Smith and Dr. Leroy Riddick.

Dr. Smith looked at autopsy photos of Hebert, videotapes of the crime scene, photos of the crime scene, photos of the sword, Dr. Hayne's autopsy report, the Mississippi Crime Lab's report, and the DNA reports provided by Reliagene. In his opinion, the presence on the sword of blood from an unnamed source "should have

23

been exculpatory." (Pet. Ex. 8, at 3, ECF No. 1-11.) Dr. Smith speculates that this evidence shows a third party actually murdered Hebert and then put the sword in his truck. That would have to have occurred before Spicer took the truck to Pascagoula, supposedly not knowing that the bloody sword was present. This is, of course, mere conjecture about what the evidence indicates. There exist even more non-exculpatory alternative explanations for how a third party's blood could have gotten on the sword. And DNA evidence still connected Spicer to Hebert – the swab from Spicer's pants and t-shirt showed the blood stains on Spicer's clothing to be consistent with Hebert's blood. It is also worth noting that although Spicer's attorneys did not emphasize the presence of a potential third party's blood on the sword, Reliagene's employee, Amrita Lal, testified on direct examination at trial that the blood found on the sword was a mixture of multiple persons' blood, one of whom was Hebert, but that Spicer's blood was not consistent with the sample. The Court cannot say, therefore, that the jurors did not have this information before them.

Dr. Smith also opines that the sword did not cause Hebert's wounds. Dr. Smith agrees with Haynes's conclusion that Hebert's death was due to blunt force trauma, but maintains that the wounds failed to reflect the surface characteristics of the sword. He concedes, however, that "this may be due in part to the orientation of the photographs and size of the prints . . . ." (*Id.*) He further opines that Hebert would have to have been struck by the hilt of the sword in order to

suffer the fatal wound to his head, but that no mark on Hebert matches any part of the sword's hilt.

Dr. Riddick's affidavit is a more detailed summary of Dr. Smith's criticisms of Dr. Hayne's testimony and report. Dr. Riddick reviewed evidence and testimony offered at trial to arrive at the conclusion, like Dr. Smith, that the injuries sustained by Hebert were inconsistent with the prosecution's theory that the sword and/or sheath were the murder weapon. He believes that Dr. Hayne should have examined the sword more closely and compared Hebert's wounds with the sword's characteristics: "no detailed description of the sword – including the weight, width, sharpness and thickness of the blade or the characteristics of the material on the handle – was made." (Pet. Ex. 7, at 6, ECF No. 1-10.) Notwithstanding this lack of information, Dr. Riddick has assumed that the sword was a "decorative sword associated with the fantasy game Dungeons and Dragons and designed for display." (*Id.*) The Court has reviewed the trial transcript for an indication that the sword was so designed and has found none.

Dr. Riddick opines that the sword could not have been the murder weapon because "[s]uch swords typically lack the weight, shape and surface features necessary to inflict the wounds described by Dr. Hayne and depicted in the photographs." (*Id.*) He admits, however, that the record does not contain any information one way or another to support this conclusion. Dr. Riddick makes assumptions about how the sword would have to have been held to inflict the

damage seen on Hebert's body. He believes, based on his assumptions, that the sword would have been bent in the attack if the flat side of the sword had struck Hebert. Dr. Riddick also suggests that Spicer should have had a significant amount of blood on him if he were the assailant, but because "[t]here is no description of Mr. Spicer having blood on him when he was apprehended, and there is no evidence at the scene of someone having washed off blood," Dr. Riddick speculates that any blood on Spicer's shirt and pants could have come from another source. (*Id.* at 13.)

Having reviewed the affidavits of Dr. Smith and Dr. Riddick, it is clear that both experts could have offered meaningful testimony that could have cast doubt on some of Dr. Haynes' opinions. But it is also clear that the opinions they have offered are based on incomplete information supplemented by assumptions. These assumptions may be correct, or they may be wrong. Even if their assumptions about the nature of the sword are presumed correct, the jury would have been left with conflicting expert opinions about the weapon used to kill Hebert. Dr. Hayne testified that Hebert's injuries could have been caused by the sword. As to the notion that Hebert's blood on Spicer's shorts could have theoretically come from some other event, the jury did not need a medical expert to inform them of this possibility. In fact, the best person to explain where the blood on Spicer's clothes came from and why the sword with Hebert's blood was in the truck was Spicer. This was true regardless of whether Spicer were to have argued self-defense or that

he was simply not the person who killed Hebert. Spicer's attorneys counseled him

to testify on his own behalf (even though they did not know whether he would

testify), but he ultimately refused to do so. Again, given the significant evidence

indicative of Spicer's guilt, the Court cannot say that the failure of trial counsel to

offer countervailing expert opinions at trial undermined confidence in the jury's

verdict. *See Sanchez v. Davis*, 888 F.3d 746, 752 (5th Cir. 2018) (holding that

counsel's failure to offer further evidence on self-defense was not ineffective

assistance where his client's failure to testify thwarts that defense).

Finally, Spicer maintains that Spicer's attorneys should have investigated

prosecution witnesses Michael Jones, Angel Hinger, and Arthur Creel before trial

because their testimony could have been more effectively impeached on cross

examination. Spicer says his attorneys failed to adduce evidence that Jones and

Hinger were each previously convicted of crimes involving dishonesty. Jones had

pleaded guilty to false pretense, and Hinger to forgery and credit card fraud. As to

Creel, Spicer argues that his testimony at trial was clearly inconsistent with his

testimony during his pretrial videotaped statement. The Court finds these

arguments to be without merit.

Jones testified that Spicer told him the truck he was driving was stolen. On

cross examination, Spicer's counsel elicited from Jones that he was presently

incarcerated for arson. The Court finds it highly unlikely that the jury's knowledge

of Jones' past conviction for false pretense would have meaningfully undermined his

credibility further in the eyes of the jury. He was already appearing before them in a prison jumpsuit. Hinger's testimony was corroborative of Deputy White's testimony that Spicer fled from law enforcement. Spicer's counsel elicited from Hinger than she was also a convicted felon, and she too appeared before the jury in a prison jumpsuit. It is unlikely that the specifics of her convictions for forgery and credit card fraud would have further undermined her credibility. Moreover, counsel argued to the jury that the jury should find their testimony unreliable.

The asserted discrepancy in Mr. Creel's testimony is pure speculation on the part of Spicer. Magistrate Judge Gargiulo previously explained the shortcomings in Spicer's argument:

> Spicer argues that in Creel's trial testimony, Creel said that he saw Spicer and Hebert enter the trailer together at about 11:00 p.m. on the night of the murder, but his prior statement said that Hebert and Spicer left the trailer together at around 10:00 p.m. that evening. Spicer notes that later in the interview, Creel said that he went to bed between 8:00 and 9:00 p.m. on the night of the murder and did not awaken until the following morning.
>
> Without making any factual findings, the Court notes that this may not be an accurate representation of Creel's trial testimony. At trial, Creel stated that he saw Hebert and Spicer come in around dinnertime, at 11:00. In Mississippi, the term "dinner" is as likely to be applied to the mid-day meal as to the evening meal, often referred to as "supper." In his pretrial statement, Creel said that Spicer and Hebert came and went several times that morning, the last being around 10:00. If his statement is read in its entirety, the chronology of events that Creel recalled from that day clearly places Spicer's and Hebert's arrival as occurring in the middle of the day. In neither his trial testimony nor his pretrial statement does Creel

> refer to seeing them in the evening. His pretrial
> statement refers to them leaving "after dinner," while he
> was lying down to take a nap. Later, he said, "Truck
> didn't come no [sic] Friday at all, Thursday night at all as
> far as I know I did not see no truck at all on Thursday
> night or Friday until uh, the law come over and found,
> you know, found him in the trailer." (ECF No. 32-4, at
> 99).

(R. & R. 16 n.2, ECF No. 38.) On this record, the Court finds that Spicer's

arguments regarding how his counsel should have more effectively cross-examined

these three witnesses to be without merit. Spicer cannot show that he was

prejudiced by these omissions.

## V. CONCLUSION

Having reviewed each of Spicer's claims for habeas corpus relief under a *de novo* standard of review, it appears that none of his claims – individually or in the aggregate – possesses sufficient merit to warrant issuance of the writ. "[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Ross v. Oklahoma*, 487 U.S. 81, 91 (1988) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)). As the Court has repeatedly emphasized, the evidence against Spicer was strong, if not overwhelming. "'[T]he jury, cognizant of [this] overwhelming evidence of guilt, would have found [Spicer] guilty even if' the errors [Spicer] alleges here had been rectified." *King*, 883 F.3d at 595 (quoting *Pondexter*, 537 F.3d at 524). This leads the Court to conclude that correcting all the errors Spicer alleges would not have produced a "reasonable probability" of a different result. *See*

*Strickland*, 466 U.S. at 694. Habeas relief under 28 U.S.C. § 2254 is therefore not available to Spicer.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that Fred Stanford Spicer's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 is hereby **DENIED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that this action is hereby **DISMISSED** with prejudice. A separate final judgment shall be entered in accordance with FED. R. CIV. P. 58.

**SO ORDERED AND ADJUDGED** this the 15th day of October, 2018.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE